# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1154 | **DATE** | 7/6/2004 |
| **CASE TITLE** | Raw Materials, Inc. vs. Manfred Forberich GMBH & Co. KG | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT: Plaintiff's motion for summary judgment is denied. Status hearing date of 7/22/04 to stand.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JUL 7 – 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 26 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | 2004 JUL -6 PM 4:27 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RAW MATERIALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 1154 |
| | ) | |
| vs. | ) | Judge Mark Filip |
| | ) | |
| MANFRED FORBERICH GMBH & | ) | |
| CO., KG, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER DENYING
## PLAINTIFF RAW MATERIALS INC'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Raw Materials, Inc. ("RMI" or "Plaintiff"), an Illinois corporation that deals in used railroad rail, has brought suit against Defendant Manfred Forberich GMBH & Co., KG ("Forberich" or "Defendant"), a German limited partnership that sells such rail, alleging breach of contract and fraud relating to Defendant's undisputed failure to meet its contractual obligation to deliver 15,000-18,000 metric tons of used railroad rail to Plaintiff. Plaintiff has moved for summary judgment on its breach of contract claim. Defendant has defended on *force majeure* grounds. For the reasons stated below, Plaintiff's motion is denied.

### RELEVANT FACTS

RMI is located in Chicago Heights, Illinois. Its primary business is purchasing, processing, and selling used railroad rail which is eventually reheated and rerolled into new products, such as fence posts or sign posts. (D.E. 21 at 1-2.) Forberich is located in Germany and is in the business of selling used railroad rail. Forberich generally obtains its rail from the former Soviet Union. (D.E. 23 at 1.)

On February 7, 2002, RMI entered into a written contract with Forberich in which Forberich agreed to supply RMI with 15,000-18,000 metric tons of used Russian rail. (D.E. 21 at 3.) The rail was to be shipped from the port in St. Petersburg, Russia.[1] It takes approximately three to four weeks for ships loaded with rail to travel from St. Petersburg, Russia to the United States. (D.E. 21 at 14.) The contract provides for "Delivery by: 6-30-2002," "F.O.B. Delivered Our Plant, Chicago Heights, IL," and "Shipping Instructions: RMI, INC. c/c Chicago Heights Steel, Chicago Heights, IL 60411." (D.E. 19, Ex. 7, at MF0027.)

The parties agree that in June 2002, Forberich sought an extension of its time for performance under the contract. (D.E. 23 at 4.) However, the circumstances surrounding the extension request are disputed. Forberich maintains that, pursuant to its normal practice, it had "earmarked" a particular supplier, Imperio Trading ("Imperio"), to provide it with rails that it would use to fulfill its contract with RMI. (D.E. 23 at 2-3). In late June 2002, Imperio defaulted on its contractual obligation to provide rail to Forberich. (D.E. 23 at 4.) Forberich claims that it requested an extension from RMI because of this breach. (*Id.*) RMI disputes that Forberich intended to use rail from Imperio to fulfill Forberich's contract with RMI. (*Id*). RMI also asserts, without citing any record evidence, that Forberich's request for an extension was based on a false representation that Forberich was unable to obtain a supply of rail from any source sufficient to meet its obligations to RMI by June 30, 2002.[2] (D.E. 18 at 7, 9.)

---

[1] The parties do not expressly state in their Rule 56.1 Statements that the rail was to be shipped from St. Petersburg, but both parties appear to assume that this is true. (*See* D.E. 22 at 7 (plaintiff stating that "Forberich was obligated to ship the rails from St. Petersburg"); *see also* D.E. 20 at 4-5.)

[2] RMI does not identify any record evidence which supports its contention that, in seeking the extension, Forberich falsely represented that it was unable to obtain a supply of rail from any source by June 30, 2002. RMI cites only to paragraph 14 of its 56.1 Statement, (D.E. 18 at 7),

2

Whatever the reasons Forberich may have given in seeking its extension, the parties do not dispute that RMI agreed (apparently in a telephone conversation between Mr. Forberich and RMI Vice President Ron Owczarzak, (D.E. 21, Ex. O)),[3] to extend in some manner the time for Forberich to perform the contract. (D.E. 23 at 4.) However, the parties dispute the terms of the extension. RMI contends that it agreed to extend the delivery date (meaning delivery at RMI's place of business) to a date "later in the calendar year," but that the delivery date was never fixed due to Forberich's failure to attend a planned meeting in Chicago to discuss the extension. (D.E. 23 at 4; D.E. 21, Ex. O; D.E. 19, Ex. 3, at 55.) For purposes of its motion for summary judgment, "RMI has assumed that had Forberich delivered the contracted goods to RMI's plant by December 31, 2002, the Contract would have been satisfied." (D.E. 22 at 4 n.1.) Mr. Owczarzak testified that he "would have been satisfied had the 15,000 to 18,000 tons, metric tons of rail, been delivered to a port in the United States as of December 31st, 2002," and that he conveyed this to Mr. Forberich, though he did not specify when or how (orally or by letter).[4]

---

which states "Forberich subsequently sought an extension of the delivery date until December 31, 2002." (D.E. 19, ¶ 14.) At a minimum, it appears, based on the material cited to the Court, that a jury could reject Plaintiff's assertion about the circumstances surrounding the extension.

[3] The material portion of the letter Mr. Owczarzak sent to Mr. Forberich on June 27, 2002, regarding their initial conversation about the extension states as follows: "[w]ith reference to our telephone conversation of Wednesday, [sic] Jun 26, 2002, RAW MATERIALS, INC. has agreed to extend the delivery date from June 30, 2002 until a later date during this calendar year on CONTRACT FORB 3464/02. This later date will be confirmed sometime during your visit to Chicago in July of this year." (D.E. 21, Ex. O.) Mr. Owczarzak testified that he and Mr. Forberich had further discussions but he did not testify to the content of these discussions in detail. (D.E. 19, Ex. 3, at 55.)

[4] Perhaps because of Mr. Owczarzak's testimony that he would have been satisfied if Forberich had shipped the rail to a U.S. port by December 31, 2002, neither party has offered any evidence regarding how long it would take to transport 15,000 to 18,000 metric tons of rail from a U.S. port to RMI's plant in Chicago Heights.

3

(D.E. 19, Ex. 3 at 55.) Mr. Forberich's declaration states that he understood that Forberich "had until December 31, 2002 to load the rails and execute the bill of lading to be in compliance with the contract." (D.E. 21, Ex. C, ¶11.)

Although it is undisputed that Forberich "has never delivered the contracted goods to RMI," (D.E. 21 at 5), the question of whether Forberich was required to deliver the rails to RMI's place of business by December 31, 2002 or merely was obligated to load the rails on a ship by that date is nevertheless significant because it bears on the viability of Forberich's contention that its failure to perform should be excused. Forberich asserts that its failure to perform should be excused because it was prevented from shipping the rail by the fact that the St. Petersburg port unexpectedly froze over on approximately December 1, 2002. (D.E. 22 at 4-5.) According to RMI, on the other hand, the port did not freeze over until mid-December 2002, and, since it takes 3-4 weeks for a ship carrying rail to travel from St. Petersburg to the United States, Forberich would have had to have shipped out the rail before the port froze in order for the shipment to arrive by the December 31, 2002 deadline. (D.E. 22 at 7-8.) Thus, RMI contends that Forberich's failure to perform under the contract could not have been due to the freezing of the port.[5] (*Id.*) In other words, according to RMI, regardless of whether the port froze in mid-December 2002, Forberich would have breached the contract in any event because it did not load its ships early enough so that they would arrive by the December 31, 2002 deadline. If, however, Forberich was merely required to load the rail by December 31, 2002, then the freezing over of the port could have prevented Forberich from shipping the rail regardless of whether the port froze on December 1 or in mid-December.

---

[5] RMI asserts that Forberich chose not to ship the rail to RMI so that Forberich could, by subsequently entering into more lucrative contracts with other purchasers, take advantage of a rise in rail prices that occurred after RMI and Forberich entered their contract (D.E. 18 at 9.)

4

The parties do not dispute that, in a typical winter, the St. Petersburg port does not freeze over until late January, and such freezing does not prevent the vessels from entering and exiting the port. (D.E. 23 at 6.) Mr. Forberich testified that ice breakers are normally used to allow for shipping. (D.E. 21, Ex. F, at 106.) He further testified that the winter of 2002 was the worst winter in St. Petersburg in almost sixty years and that ice interfered with shipping at the end of November and that even the icebreakers were stuck in the ice. (*Id.*) He also testified that these were "unexpected weather conditions." (*Id.* at 77.) In relation to issues concerning the freezing of the port, Forberich also submitted the declaration of Mikahil Nikolaev, who works at the St. Petersburg port. (D.E. 21, Ex. P.) Mr. Nikolaev's declaration essentially states the same facts that Mr. Forberich testified to regarding the freezing of the port, except that the declaration states that the port was frozen over on December 1, 2002, that such early freezing had not occurred since 1955, and contains the conclusion that no one could have predicted the early freezing of the port.[6] (*Id.*, ¶¶ 7, 10.) Without citation to the record, RMI's counsel states in RMI's brief in support of summary judgment that "it hardly could come as a surprise to any experienced shipping merchant (or any grammar school geography student) that the port in St. Petersburg might become icy and frozen in the Russian winter months." (D.E. 18 at 12.) One of Forberich's ships left the St. Petersburg port on approximately November 20, 2002. (D.E. 22 at 7-8, citing (D.E. 21 at 13.)) No evidence has been presented that any ships left the St. Petersburg port until months after November 20, 2002.[7] On January 10, 2003, Mr. Forberich

---

[6] RMI argues that Mr. Nikolaev's declaration should be stricken on grounds that it lacks support, is based on speculation, and because Mr. Nikolaev was not disclosed as a witness. (D.E. 22 at 7-8 n.2.) The Court need not reach this issue because, as shown below, the Court did not need to rely on Mr. Nikolaev's declaration in reaching its decision.

[7] Forberich admitted that one of its customers received shipments of rail from approximately January 20, 2003 through March 14, 2003, (D.E. 21 at 12), but no evidence has been presented

5

sent Mr. Owczarzak a letter stating that Forberich could not ship the rails because "[s]ince the last 3 weeks the port is as well as frozen and nothing is possible." (D.E.19, Ex. 8).

LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir.2004). Once the moving party satisfies this burden, the nonmovant must set forth specific facts showing that there is a genuine material issue for trial. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir.2001). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

---

regarding when the shipment(s) left St. Petersburg or whether the relevant delivery ship used multi-destination or other indirect delivery route(s). In fact, the record material cited by Plaintiff invites questions about how the deliveries occurred, as there appears to have only been one ship involved (the M/V Rosina Topic) and yet the customer received "several shipments of rail" from Defendant from January 20, 2003 through March 14, 2003. (D.E. 19, Ex. 16 at 2.) Presumably, this vessel could not (even putting aside the ice question) have made "several" trips between the U.S. and St. Petersburg, simply because of the time involved to make the trip. (The customer is in the United States.) (*Id.*, Ex. 16 at 1.) So, to the extent things are clear from the limited information provided, it appears that some of the "several" shipments may have been sitting on a dock or in a warehouse before they eventually were delivered over the extended period of time. If that is true, then it would appear possible that the rail initially delivered on January 20, 2003, also may have been sitting somewhere (or was the subject of an indirect route to the U.S. from St. Petersburg). In any event, Plaintiff has not foreclosed these factual questions. In addition, as noted above, although shipments to the U.S. from St. Petersburg normally take 3-4 weeks, Mr. Forberich testified that the unusual ice conditions in the winter of 2002-2003 delayed deliveries by months. (D.E. 21, Ex. F at 106.)

DISCUSSION

As set forth above, it is undisputed that Forberich was contractually obligated to ship 15,000 to 18,000 metric tons of rail to RMI and that it failed to do so. Thus, Forberich's ability to avoid summary judgment is dependant on whether it has presented sufficient evidence to support its affirmative defense of *force majeure* based on the theory that it was prevented from performing by the freezing over of the St. Petersburg port.[8] For the reasons explained below, the Court denies Plaintiff's motion for summary judgment.

A. Applicable Law

The parties agree that their contract is governed by the Convention on Contracts for the International Sale of Goods ("CISG"). (D.E. 18 at 5; D.E. 20 at 9.) Although the contract does not contain an express *force majeure* provision, the CISG provides that:

> A party is not liable for failure to perform any of his obligations if he proves that failure was due to an impediment beyond his control and that he could not reasonably be expected to have taken the impediment into account at the time of the conclusion of the contract or to have avoided or overcome its consequences.

CISG Art. 79. RMI asserts that "[w]hile no American court has specifically interpreted or applied Article 79 of the CISG, caselaw interpreting the Uniform Commercial Code's ("U.C.C.") provision on excuse provides guidance for interpreting the CISG's excuse provision since it contains similar requirements as those set forth in Article 79." (D.E. 18 at 8 n.5.) This approach of looking to caselaw interpreting analogous provisions of the UCC has been used by other federal courts. *See, e.g., Delchi Carrier SpA v. Rotorex Corp.*, 71F.3d 1024, 1028 (2d Cir.1995) ("caselaw interpreting analogous provisions of Article 2 of the Uniform Commercial Code

---

[8] In its memorandum in support of its motion for summary judgment, RMI appears to anticipate that Forberich would base its *force majeure* defense on the default of Forberich's supplier, Imperio. (D.E. 18 at 7-8.) However, Forberich has not made such a contention. (D.E. 20.)

7

("UCC") may also inform a court where the language of the relevant CISG provisions track that of the UCC"); *Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, No. 01-4447, 2004 WL 1166628, at *4 (N.D. Ill. May 21, 2004) (same). Furthermore, Forberich does not dispute that this is proper and, in fact, also points to caselaw interpreting the UCC. (D.E. 20 at 9 n.6.). Accordingly, in applying Article 79 of the CISG, the Court will use as a guide caselaw interpreting a similar provision of § 2-615 of the UCC.

Under § 2-615 of the UCC, "three conditions must be satisfied before performance is excused: (1) a contingency has occurred; (2) the contingency has made performance impracticable; and (3) the nonoccurrence of that contingency was a basic assumption upon which the contract was made." *Waldinger Corp. v. CRS Group Engineers, Inc.*, 775 F.2d 781, 786 (7th Cir. 1985). The third condition turns upon whether the contingency was foreseeable; "[i]f the risk of the occurrence of the contingency was unforeseeable, the seller cannot be said to have assumed the risk. If the risk of the occurrence of the contingency was foreseeable, that risk is tacitly assigned to the seller." *Id.* RMI does not dispute that the freezing over of the port in St. Petersburg was a contingency. Rather, RMI essentially argues that it is entitled to summary judgment because the second and third conditions do not apply inasmuch as the undisputed facts show that the frozen port did not prevent Forberich from performing the contract and that the freezing of the port was foreseeable. Based on the record material cited by the parties, the Court respectfully disagrees.

B.  Whether the Frozen Port Could Have Prevented Performance

As mentioned above, RMI contends that the frozen port could not have prevented Forberich from performing because the port did not freeze over until mid-December 2002, and, since it takes 3-4 weeks for a ship carrying rail to travel from St. Petersburg to the United States, Forberich would have had to have shipped out the rail before the port froze in order for the shipment to arrive by the December 31, 2002 deadline. (D.E. 22 at 7-8.) RMI's argument is premised on its contention that it has established beyond genuine dispute that Forberich was obligated to ship the materials so that they would arrive by December 31, 2002 (rather than just load the ships by that date, as Forberich contends). In this regard, RMI asserts that Forberich's admission in its answer that it "promised to deliver the aforementioned goods at RMI's place of business on or before June 30, 2002," (D.E. 9 at 2.), is a judicial admission. While the Court agrees that this statement in RMI's answer is a judicial admission that establishes beyond contention the fact that Forberich initially promised to deliver the rail at RMI's place of business on or before June 30, 2002, *see Solon v. Gary Community School Corp.*, 180 F.3d 844, 858 (7th Cir.1999) ("That Gary Schools admitted the length of Bohney's service in its answer was not simply evidence as to this eligibility criterion, but a judicial admission which removed this point from the realm of contested issues"), this does not establish the inapplicability of the *force majeure* defense for at least two independent reasons.

First, even assuming that Forberich was obligated to deliver the rails by December 31, 2002, Forberich has nonetheless presented evidence (which the Court must construe in the light most favorable to Forberich) that the frozen port prevented it from meeting this obligation. In particular, Mr. Forberich testified that ice interfered with shipping not just in mid-December, but as early as the end of November. (D.E. 21, Ex. F, at 106.) The fact that a Forberich ship left the

9

port on approximately November 20, 2002 is not inconsistent with the port freezing in the remaining ten days or so of that month. Furthermore, as noted above, no conclusive evidence has been presented that any ships left the St. Petersburg port until months after November 20, 2002. In light of the undisputed fact that delivery to a port in the U.S. from St. Petersburg takes at least 3-4 weeks and Mr. Owczarzak's testimony that he "would have been satisfied had the 15,000 to 18,000 tons, metric tons of rail, been delivered to a port in the United States as of December 31st, 2002," (D.E. 19, Ex. 3 at 55), Forberich has presented evidence that it would have been in position to meet a December 31, 2002 deadline for delivery to the U.S. by shipping out rail in the last week or so of November or the first few days of December but was prevented from doing so by the frozen port. Thus, for this reason alone, there is a disputed question of fact as to whether the frozen port prevented Forberich from performing its contractual obligations.

The second reason RMI has failed to demonstrate that the frozen port did not prevent Forberich's performance is that although it is established beyond contention that Forberich promised in the February 7, 2002, written agreement that Forberich would deliver the rail at RMI's place of business on or before June 30, 2002, an issue of fact exists regarding the nature of the extension Mr. Owczarzac orally agreed to for the time for performance of the contract.[9] Neither side has presented evidence of what exactly was said by Mr. Owczarzak and Mr. Forberich during the initial telephone conversation in which Mr. Owczarzak agreed to an extension. On June 27, 2002, Mr. Owczarzak sent Mr. Forberich a letter stating "[w]ith reference to our telephone conversation of Wednesday, [sic] Jun 26, 2002, RAW MATERIALS, INC. has agreed to extend the delivery date from June 30, 2002 until a later date during this

---

[9] As indicated by the fact that the parties agreed to the extension, there is no requirement in the contract that any modification be in writing. Furthermore, under the CISG, "[a] contract may be modified or terminated by the mere agreement of the parties." CISG Art. 29.

calendar year on CONTRACT FORB 3464/02. This later date will be confirmed sometime during your visit to Chicago in July of this year." (D.E. 23 at 4; D.E. 21, Ex. O.) However, this letter contemplates further discussions and, although the parties apparently did not meet in Chicago in July, Mr. Owczarzak testified that they did have further discussions, though he did not testify to the content of these discussions in detail. (D.E. 19, Ex. 3, at 55.) Mr. Owczarzak also testified that he conveyed to Mr. Forberich that delivery to any port in the U.S. by December 31, 2002 would be satisfactory but he did not specify when or how (orally or by letter) he made this communication. (*Id.*) In his declaration, Mr. Forberich stated that his understanding was that Forberich was given an extension "until December 31, 2002 to load the rails and execute a bill of lading to be in compliance with the contract." (D.E. 21, Ex. C, ¶ 11.)

Given that the original contract obligated delivery to RMI's place of business in Chicago Heights by June 30, 2002, it appears unlikely that Mr. Owczarzak would have done more than agree to extend the delivery date to December 31, 2002, and change the delivery location to any U.S. port, but the evidence is unclear and contradictory and it is not the Court's role in deciding a summary judgment motion to weigh evidence. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also David Copperfield's Disappearing, Inc. v. Haddon Advertising Agency, Inc.*, 897 F.2d 288, 292 (7th Cir. 1990) (stating that "the intent of the parties to an oral contract is generally a question of fact."). Thus, a question of fact exists as to whether Forberich was obligated to deliver the rail to the U.S. by December 31, 2002 or whether Forberich was merely required to load the rail by that date. Consequently, since it cannot yet be determined whether Forberich would have met its contractual obligations by shipping rail from the port at the end of December, a question of fact exists as to whether the port's freezing prevented Forberich from performing its obligation, even assuming the port froze in mid-December.

11

C.  Foreseeability

RMI's sole basis for its contention that the early freezing of the port was foreseeable is the assertion, without citation to the record, in its brief in support of summary judgment, that "it hardly could come as a surprise to any experienced shipping merchant (or any grammar school geography student) that the port in St. Petersburg might become icy and frozen in the Russian winter months." (D.E. 18 at 12.) However, Forberich presented evidence that the severity of the winter in 2002 and the early onset of the freezing of the port and its consequences were far from ordinary occurrences. It is undisputed that although the St. Petersburg port does usually freeze over in the winter months, this typically does not happen until late January, and such freezing does not prevent the vessels from entering and exiting the port. (D.E. 23 at 6.) More to the point, Mr. Forberich testified that although ice breakers are normally used to allow for shipping, the winter of 2002 was the worst winter in St. Petersburg in almost sixty years and that ice interfered with shipping at the end of November and that even the icebreakers were stuck in the ice. (D.E. 21, Ex. F, at 106.) He also testified that these were "unexpected weather conditions." (*Id.* at 77.) Whether it was foreseeable that such severe weather would occur and would stop even the icebreakers from working is a question of fact for the jury. In so holding, the Court notes that the freezing over of the upper Mississippi River has been the basis of a successful force majeure defense. *See Louis Dreyfus Corp. v. Continental Grain Co.*, 395 So.2d 442, 450 (La. Ct. App. 1981). In sum, because questions of fact exist as to whether the early freezing of the port prevented Forberich's performance and was foreseeable, Forberich's *force majeure* affirmative defense may be viable and summary judgment would be inappropriate.[10]

---

[10] Because the Court has denied Plaintiff's motion as to liability, it need not reach the issue of damages.

12

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is denied.

*Mark Filip*
Mark Filip
United States District Judge
Northern District of Illinois

Enter: JUL 6 - 2004